UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE DERIENZO,

                Plaintiff,

     - against -

METROPOLITAN TRANSPORTATION
AUTHORITY and METRO NORTH
COMMUTER RAILROAD,

            Defendants.

01 Civ. 8138 (LTS)

---

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

**HOGUET NEWMAN REGAL & KENNEY, LLP**
**10 EAST 40TH STREET**
**NEW YORK, NEW YORK 10016**
**(212) 689-8808**

**ATTORNEYS FOR DEFENDANTS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   DeRienzo's Back Claim . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   The Back Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.   The Appearance of Symptoms of Pituitary Apoplexy.. 5

    E.   There is No Scientific Evidence that the Surgery Caused the Apoplexy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    F.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.   Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . 8

    II.  General Principles of Liability Under The FELA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III. Plaintiff Cannot Establish that the Fall Down the Steps Caused his Pituitary Apoplexy . . . . . . . . . . . . . 9

        A.   Proof of Causation of Physical Injury . . . . . . . 10

        B.   Plaintiff Cannot Prove that the Surgery Caused the Pituitary Apoplexy . . . . . . . . . . . . . . . . . . . . 12

            1.   Dr. Pikus is Admittedly Uncertain . . . . . . 13

            2.   Dr. Pikus's Opinion Is Unreliable . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

### CASES

Amorgianos v. Nat'l R.R. Passenger Corp.,
     303 F.3d 256 (2d Cir. 2002)........................10-12,17

Anderson v. Liberty Lobby, Inc.,
     477 U.S. 242 (1986) ................................. 9

Barnes v. Anderson,
     190 F.3d 47(2d Cir.), rev'd on other grounds,
     202 F.3d 150(2d Cir. 1999) .......................... 10

Celotex Corp. v. Catrett,
     477 U.S. 317(1986) ................................. 8,9

Daubert v. Merrell Dow Pharm., Inc.,
     509 U.S. 579(1993)........................... 1,11,12,14

DeRienzo v. Metropolitan Transportation Authority,
     404 F.Supp. 2d 555 (S.D.N.Y. 2005) .................. 8

DeRienzo v. Metropolitan Transportation Authority,
     No. 01 Civ 8138, 2006 WL 2563770
     (S.D.N.Y., September 6, 2006)....................... 8

DeRienzo v. Metropolitan Transportation Authority,
     237 Fed. Appx. 642, 2007 WL 1814277 (2nd Cir. 2007).... 8

Fane v. Zimmer,
     927 F.2d 124 (2d Cir. 1991) ........................ 10

Gen. Elec. Co. v. Joiner,
     522 U.S. 136 (1997) ................................ 17

Greene v. LIRR,
     280 F.3d 224 (2d Cir. 2002) ........................ 2

Kumho Tire Co. v. Carmichael,
          526 U.S. 137 (1999)... .................10,11,14,17

Mayhew v. Bell Steamship Co.,
     917 F.2d 961(6th Cir. 1990) .......................13,14

O'Connor v. Commonwealth Edison Co.,
      13 F.3d 1090 (7th Cir.), cert. denied, 512 U.S.
      1222 (1994) ........................................ 11

Prohaska v. Sofamor, S.N.C.,
      138 F. Supp. 2d 422 (W.D.N.Y. 2001) ................. 14

Raskin v. the Wyatt Co. 125 F.3d 55 (2d Cir. 1997) ........ 11

Riegel v. Medtronic, 451 F.3d 104 (2d Cir. 2006). . . . 11,12,17

Roberts v. Consolidated Rail Corporation,

      832 F.2d 3 (1st Cir. 1987) ......................... 9

Ruggiero v. Warner-Lambert Co., 424 F.3d 249

      (2d Cir. 2005) ..................................... 12

Schulz v. Celotex Corp.,
      942 F.2d 204 (3d Cir. 1991) ........................ 13

Sinclair v. LIRR,
      985 F.2d 74 (2d Cir. 1993) ......................... 9

Turner v. Iowa Fire Equip. Co.,
      229 F.3d 1202 (8th Cir. 2000) ...................... 11

U.S. v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). . . . .11,12

Washburn v. Merck & Co.,
      213 F.3d 627 (table) No. 99-9121, 2000 WL 528649
      (2d Cir. May 1, 2000) .............................. 17

Wills v. Amerada Hess Corp., No. 98 CIV. 7126,
      2002 WL 140542 (S.D.N.Y. Jan. 31, 2002) ............ 10

Wills v. Amerada Hess Corp.,
      379 F.3d 32 (2d Cir. 2004)......................... 10,11

Yarchak v. Trek Bicycle Corp.,208 F. Supp. 2d 470
      (D.N. J. 2002) ..................................... 15

## PRELIMINARY STATEMENT

Plaintiff, a former Metropolitan Transportation Authority ("MTA") police officer, sues under the Federal Employers Liability Act, ("FELA"), 45 U.S.C. §51 et seq., for damages he claims he sustained as a result of a fall on the property of defendant Metro-North Commuter Railroad ("Metro-North"). In particular, plaintiff claims that his fall down the steps caused him to sustain a back injury precipitating surgery on his lumbar spine and, during the course of his back surgery, a pre-existing tumor on his pituitary gland ruptured leading to some form of cognitive dysfunction. On this motion, defendants MTA and Metro-North (hereafter, collectively referred to as "defendants" or "the Railroad"), seek partial summary judgment, dismissing plaintiff's claim that its negligence caused him to sustain the pituitary rupture (known as "pituitary apoplexy"). Plaintiff has not put forward expert medical evidence that meets the Daubert standard to show that the injuries of which he complains was caused by the alleged fall. Specifically, plaintiff's claim that surgery for his back condition caused a pre-existing tumor on his pituitary gland to rupture rests on speculation rather than on an admissible expert opinion.[1]

---

[1] Defendants also vehemently contest plaintiff's claim that the fall down the steps was the proximate cause of his back injury and previously moved for summary judgment on this issue. As stated below, defendants' motion on this point was never considered by this Court. At present, the instant renewed motion for summary judgment is partial only, and focuses solely on

## STATEMENT OF FACTS

### A.   The Parties

Until October 9, 2002, when he retired with a disability pension, plaintiff was a police officer employed by defendant MTA[2]   Defendant MTA is a public benefit corporation created by and organized under the New York State Public Authorities Law, N.Y. Pub. Auth. L. §§1263 et seq., and defendant Metro-North is a wholly-owned subsidiary corporation of the MTA.   Defendants Statement Pursuant to Local Civil Rule 56.1 ("Defs. 56.1 Statement") at ¶¶1-2.

Plaintiff claims that, while on duty on September 8, 1998, he slipped and tumbled down steps at Oak Street on Metro-North property in Mount Vernon, New York (the "Oak Street Steps" or the "Steps").   He claims that he fell because defendants negligently maintained or designed the Steps and that, as a result of his fall, he developed a back condition that required him to undergo lumbar fusion surgery on May 4, 1999.   He claims that that surgery in turn caused a pre-existing pituitary tumor to hemorrhage, or become "apoplectic."

---

plaintiff's claim for the pituitary apoplexy.   Defendants reserve their right to move to preclude plaintiff's claim that the fall down the steps caused his back condition at a later stage in this litigation.
[2]   The Metro-North and Long Island Railroad Police Departments merged into a newly-formed MTA Police Department, effective January 1, 1998.   See Greene v. LIRR, 280 F.3d 224, 227 (2d Cir. 2002).

**B.**   **DeRienzo's Back Claim**

After his alleged fall, DeRienzo went to the Emergency Room at St. Joseph's Hospital in Yonkers, where he met his supervisory officer, Lt. Dian Nash. Lt. Nash had reported to St. Joseph's Emergency Room to meet DeRienzo in response to a radio communication that DeRienzo had reported a sprained left ankle. Defs. 56.1 Statement at ¶¶4-5.

Subsequent to his fall down the steps, DeRienzo was placed on injury leave by Metro-North from September 8, 1998 until November 10, 1998. Defs. 56.1 Statement at ¶6. DeRienzo was deemed by Metro-North physicians as qualified to return to full duty in November, 1998, about two months after the alleged fall down the steps. He remained on full duty continuously through the following March, six months after the alleged fall. In March, 1999, DeRienzo went out on sick leave. Defs. 56.1 Statement at ¶7.

Beginning in or around September, 1998, DeRienzo began consulting orthopedic surgeons, Drs. Robert Cristofaro and Damon DelBello. Defs. 56.1 Statement at ¶8. Prior to his alleged fall down the steps in September, 1998, DeRienzo had a long standing history of complaints of severe back pain, which had necessitated his being placed on sick leave for prolonged periods of time. These absences followed complaints of back

pain as a result of automobile accidents in 1993 and 1995, and a slip and fall on ice in 1997. Defs. 56.1 Statement at ¶¶9-10.

Based on an examination of X-Rays and MRI's, taken between the fall of 1998 and the Spring of 1999, Drs. Chrisotfaro and DelBello determined that plaintiff was suffering from degenerative disc disease between the 5th vertebra of his lumbar spine and the 1st section of his sacrum, and, at the same location, a condition known as spondylolisthesis, which is a forward slippage of one vertebra over another. Defs. 56.1 Statement at ¶11.

In or around the Spring of 1999, Dr. DelBello offered DeRienzo the option of surgery to alleviate the pain he was complaining of in his back. The surgery was elective surgery, and DeRienzo opted to have the surgery. Defs. 56.1 Statement at ¶12.

## C.    The Back Surgery

On May 4, 1999, Dr. DelBello performed lumbar fusion surgery directed at the spondylolisthesis at L-5/S-1 and the disc herniation. Dr. DelBello performed the surgery from the anterior aspect (the front) using laparoscopy, done by Dr. Aaron Roth. Defs. 56.1 Statement at ¶¶13-14.

The surgery went "without complication" (DelBello 58). The medical records indicated no jumps in any of DeRienzo's vital signs, which were level throughout the surgery, including

DeRienzo's blood pressure. DeRienzo did not experience any notable or remarkable cardiovascular changes during the laparoscopy. Defs. 56.1 Statement at ¶15.

**D.    The Appearance of Symptoms of Pituitary Apoplexy**

In the recovery room, DeRienzo developed a headache, some visual disturbances and difficulty moving his eye. Unbeknownst to DeRienzo, he had an enormous pre-existing tumor on his pituitary gland. On May 5, 1999, a CT scan and MRI revealed that this tumor had hemorrhaged, or become "apoplectic." Neurosurgeon Dr. Harold Pikus operated, removing much of the enormous tumor. Defs. 56.1 Statement at ¶¶16-17.

**E.    There is No Scientific Evidence that the Surgery Caused the Apoplexy**

There are many possible causes of pituitary apoplexy. Pituitary apoplexy usually occurs spontaneously, without any trigger. Pituitary apoplexy can also be caused by a cough, a sneeze or shock, or hypertension. Dr. Pikus believes that hypertension may actually have been the cause in DeRienzo's pituitary apoplexy. Defs. 56.1 Statement at ¶¶18-21.

There is no evidence that any of the possible causes of pituitary apoplexy which Dr. Pikus theorizes "might" happen during a surgery" actually _did_ happen during DeRienzo's back surgery. Defs. 56.1 Statement at ¶21.

One theoretical cause of DeRienzo's pituitary apoplexy

proffered by Dr. Pikus was that he experienced a particularly low drop in blood pressure or an exceedingly high increase in blood pressure during the surgery. Dr. Pikus does not know how much of a drop in blood pressure would cause a pituitary tumor to hemorrhage "because it's not [his] area of expertise." Defs. 56.1 Statement at ¶¶23-24.

Dr. Pikus did not review the anesthesiologist's report that is part of the hospital's record of DeRienzo's surgery, and does not know whether there was a drop or jump in DeRienzo's blood pressure during his back surgery. There were no prominent jumps in his blood pressure, up or down. DeRienzo's blood pressure remained within normal limits throughout the surgery, and there is no evidence that the laparoscopic procedure had any impact on DeRienzo's blood pressure. Defs. 56.1 Statement at ¶¶25-6.

The symptoms of pituitary apoplexy usually arise within 24-48 hours after the onset of apoplexy, but can appear anywhere from a few hours to a few months after the hemorrhage. DeRienzo's symptoms appeared within several hours after the conclusion of a six-hour surgery. Dr. Pikus's time frame for the appearance of symptoms following the apoplexy suggests that, in DeRienzo's case, the apoplexy may have occurred months prior to the surgery. Defs. 56.1 Statement at ¶27-8.

None of Dr. Roth's thousands of laparoscopy patients has suffered a pituitary apoplexy during or immediately after the

surgery. Defs. 56.1 Statement at ¶28.

There is no known medical or scientific literature postulating a link between laparoscopy and pituitary apoplexy. Dr. Pikus believes that DeRienzo's pituitary apoplexy may have been caused by his hypertension. Dr. Pikus's theory that "the back surgery was probably what caused the pituitary tumor to hemorrhage" is "mere speculation[]." 56.1 Statement at ¶29-31.

**F.**   **Procedural History**

Defendant moved for summary judgment in October, 2004.[3] Defendants argued that the steps on which DeRienzo allegedly fell were no longer in use and that the Railroad therefore had no notice of the allegedly hazardous condition on the steps. Defendants also moved on the grounds that plaintiff failed to proffer evidence that could establish that the injuries he complained of, to wit, his back condition and the pituitary apoplexy, were caused by his fall down the steps. By decision dated December 13, 2007, this Court, noting plaintiff's failure to file a counterstatement as required by Local Civil Rule 56.1, held that the undisputed facts showed that defendants had neither actual nor constructive notice of the hazardous condition on the steps. Accordingly, summary judgment was granted in favor of defendants. Given the Court's ruling on

---

[3] This matter was initially assigned to the late Hon. Constance Baker Motley, who passed away in 2005.

liability, the Court determined not to reach the causation issue. DeRienzo v. Metropolitan Transportation Authority, 404 F.Supp. 2d 555, 560 (S.D.N.Y. 2005). Plaintiff moved for reconsideration, which was denied by the Court. DeRienzo v. Metropolitan Transportation Authority, No. 01 Civ. 8138, 2006 WL 2563770 (S.D.N.Y., September 6, 2006). On appeal, the Court of Appeals vacated and remanded. DeRienzo v. Metropolitan Transportation Authority, 237 Fed. Appx. 642, 2007 WL 1814277, (2nd Cir. 2007). The Circuit held that questions of fact precluded summary judgment on the foresseablity issue, but remanded to this Court to determine whether defendants are entitled to summary judgment on the causation issue. DeRienzo v. Metropolitan Transportation Authority, 237 Fed Appx. 642, 2007 WL 1814277 (2d Cir., June 20, 2007).

Defendants now renew their motion, in part, for summary judgment on the issue of causation.

**ARGUMENT**

I.   **Summary Judgment Standard**

Summary judgment may be granted if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden of production, the burden of proof shifts to the non-movant to demonstrate through specific

evidentiary facts that a genuine issue of material fact exists for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Mere unsupported allegations are insufficient to defeat summary judgment. See Celotex, 477 U.S. at 324.

## II.    General Principles of Liability Under The FELA

Under the FELA, a railroad is liable to employees who suffer "injury or death resulting in whole or in part from the negligence of . . . such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, . . . track, roadbed, works, boats, wharves, or other equipment." 45 U.S.C. §51. To establish a claim under FELA, a plaintiff must "prove the traditional common law elements of negligence: duty, breach, foreseeability and causation." Sinclair v. LIRR, 985 F.2d 74, 77 (2d Cir. 1993), quoting Roberts v. Consolidated Rail Corporation, 832 F.2d 3, 6 (1st Cir. 1987).

## III.    Plaintiff Cannot Establish that the Fall Down the Steps Caused his Pituitary Apoplexy

This Court should dismiss plaintiff's claim for damages for the pituitary apoplexy allegedly caused by his back surgery. Plaintiff's expert on pituitary apoplexy is on record that the theory that the back surgery caused the apoplexy is "mere speculation." Thus, this witness is precluded from testifying, and plaintiff offers no other "proof" to support this claim.

Hence, he cannot, as a matter of law, establish this claim for these damages.

## A.   Proof of Causation of Physical Injury

To establish causation, a plaintiff must have evidence of both general causation (claimed cause <u>can</u> produce claimed effect) and specific causation (claimed cause <u>did</u> produce claimed effect). <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 154 (1999); <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 268 (2d Cir. 2002).

Where complex issues of medical causation are involved, the plaintiff must present expert medical evidence "because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." <u>Barnes v. Anderson</u>, 190 F.3d 47, 55-57 (2d Cir.), <u>quoting</u> <u>Shegog v. Zabrecky</u>, 36 Conn. App. 737, 654 A.2d 771, 776 (1995), <u>rev'd on other grounds</u>, 202 F.3d 150 (2d Cir. 1999); <u>Fane v. Zimmer</u>, 927 F.2d 124, 131 (2d Cir. 1991). This standard of proof applies in FELA cases. <u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32, 46 (2d Cir. 2004).[4]  Moreover, where, as here, expert testimony is required to establish the causation element of a FELA claim, it is well settled that the standards for admission of expert testimony are governed by the Federal

---

[4]  <u>Wills</u> is a case under the Jones Act, where the same standards of proof are applied as in FELA cases. <u>See</u> <u>Wills v. Amerada Hess Corp.</u>, No. 98 CIV. 7126, 2002 WL 140542, at *9 n.7 (S.D.N.Y. Jan. 31, 2002).

Rules of Evidence and the seminal case of Daubert v. Merrill Dow Pharmaceuticals, Inc. 509 U.S. 579, 113 S.Ct. 2786 (1993). Wills, 379 F.3d at 47 (2d Cir. 2004).[5]

An expert's opinion is admissible only if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. FRE 702; Daubert, 509 U.S. at 590, 592-93; Kumho Tire, 526 U.S. at 152. "[T]he proponent of expert testimony has the burden of establishing by preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." U.S. v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

The mere fact that plaintiff has proffered expert testimony or an expert report "is not a talisman against summary judgment." Riegel v. Medtronic, 451 F.3d 104, 127 (2d Cir. 2006), quoting Raskin v. the Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). The Second Circuit has emphasized that the court, and not a jury, should first determine the admissibility of scientific evidence and, in considering summary judgment, the district court must rely exclusively on admissible evidence. In other words, expert testimony that does not pass muster under

---

[5] These standards apply to evidence from both "treating physicians" and experts retained for the purpose of litigation. Amorgianos, 303 F.3d at 262, 270; Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000); O'Connor v. Commonwealth Edison Co., 13 F.3d 1090, 1105-06 & n.14 (7th Cir.), cert. denied, 512 U.S. 1222 (1994).

Daubert cannot defeat summary judgment. Riegel, 451 F.3d at 127, citing Amorgianos, 303 F.3d at 271. Where, as here, expert testimony is essential to support a plaintiff's claim, and there is an absence of admissible expert testimony, summary judgment in favor of defendants on that claim should be granted. Riegel v. Medtronic, 451 F.3d 104, 127 (2d Cir. 2006).

The District Court's task is to ensure "that an expert's testimony rests on a reliable foundation and is relevant to the tasks at hand." Williams, 506 F.3d at 160, quoting Daubert, 509 U.S. 597, 1113 S. Ct. 2786. The District court serves the role as the "ultimate gatekeeper." Id. "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 253 (2d Cir. 2005) quoting Amorgianos, 303 F.3d at 266. Expert testimony based on surmise and conjecture rather than on scientific basis is properly deemed inadmissible. Riegel v. Medtronic, 451 F.3d at 126.

**B.   Plaintiff Cannot Prove that the Surgery Caused the Pituitary Apoplexy**

Even if the back surgery could be linked to defendants' alleged negligence, which it cannot, DeRienzo's claim for

damages relating to the pituitary apoplexy fails because there is no admissible proof that the surgery caused the apoplexy.

Plaintiff's only possible "evidence" regarding causation is Dr. Pikus's testimony "that the back surgery was probably what caused that pituitary tumor to hemorrhage," and that he thinks that "there are three relatively straight forward mechanisms by which this surgery almost certainly led to the hemorrhage" (Pikus 32-33, 36-37). However, Dr. Pikus's opinion is inadmissible under Daubert's reliability standards.

## 1.   Dr. Pikus is Admittedly Uncertain

Dr. Pikus opines merely that the surgery "probably" caused the apoplexy, and even concedes in his Case Study that "[f]urther work-up of this patient is necessary to see if any of [the risk factors he discusses in the Case Study] may have been the catalyst in the development of pituitary apoplexy" (Case Study, at 3), and may reveal that "the development of the syndrome in this patient was a spontaneous and unhappy coincidence" (Case Study, at 4 (emphasis added); Pikus 77).

A medical opinion that a factor "probably" caused an injury is not admissible to establish causation. See Schulz v. Celotex Corp., 942 F.2d 204, 209 (3d Cir. 1991) ("[T]he intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision"); Mayhew v.

Bell Steamship Co., 917 F.2d 961, 963 (6th Cir. 1990)("A medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages"); Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422, 440 (W.D.N.Y. 2001)(opinion that plaintiff "probably" got fibromyalgia as result of implant inadmissible). Having been unwilling and unable to opine definitively as to causation both in his deposition and in a publication circulated amongst his peers, Dr. Pikus may not now do so before this Court. See Kumho Tire, 526 U.S. at 152 (court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

## 2.   Dr. Pikus's Opinion Is Unreliable

Dr. Pikus's opinion is also inadmissible because it is not the product of reliable principles and methods applied to the facts of DeRienzo's surgery. See Kumho Tire, 526 U.S. at 153-54, 156-57 (court must determine whether opinion is reliable in case at hand, not in general); Daubert, 509 U.S. at 591 (expert testimony must be tied to facts of the case).

Rather, by Dr. Pikus's own admission, his opinion is based on "mere[] speculation" (Case Study, at 4). It rests on the propositions that (1) some possible causes of pituitary apoplexy

involving blood pressure "might occur during a surgery" (Pikus 33-37) and (2) DeRienzo had surgery (Pikus 33-34).[6] The missing, and necessary, link is a fact showing that there actually was an event during DeRienzo's surgery that caused his pituitary apoplexy.

Dr. Pikus admits that he knows of no such link, having not even reviewed the anesthesiologist's record of DeRienzo's blood pressure during the surgery (Pikus 62-64). That record, of course, shows that none of the events suggested by Dr. Pikus actually did occur.[7] Furthermore, Dr. Pikus expressly refuses to opine on whether a change in pressure in DeRienzo's case actually caused his pituitary apoplexy (Pikus 69-72).[8]

Dr. Pikus's opinion is also unreliable because he did not do a differential diagnosis in which he "specifically negate[s] other alternative causes." See Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 497 (D.N.J. 2002). Dr. Pikus lists a slew of possible causes of pituitary apoplexy other than

---

[7]     Dr. Blum also testified that "during surgery you can lose blood and/or drop your blood pressure and those are known to lead to pituitary apoplexy" (Blum 69). But he too admitted that he did not know whether there was a blood loss or drop in blood pressure during DeRienzo's surgery (Blum 70).

[8] The anesthesiologist's record, in fact, shows that none of the blood-pressure-related mechanisms identified by Dr. Pikus actually occurred during DeRienzo's surgery (Roth 37, 55-56; DelBello 60-61, 64).

"[c]ompromise of blood flow" (Case Study, at 2), including a spontaneous hemorrhage or hypertension (from which DeRienzo suffers), a cough, a sneeze, diabetes, shock, estrogen therapy, changes in intracranial pressure, edema, and "probably others" (Case Study, at 3-4; Pikus 76). Yet, he reports no methodology or basis for ruling out any of those possibilities (including the possibility that it occurred spontaneously) or for determining that the surgery was the cause in DeRienzo's case. Indeed, he cautions his readers that a differential diagnosis remains to be done (Case Study, at 4). Further, Dr. Pikus not only fails to rule out hypertension, but explicitly leaves open the possibility that it was the actual cause in DeRienzo's case (Pikus 37; Case Study, at 3-4).

It is also significant that, according to Dr. Pikus, the symptoms of pituitary apoplexy usually appear 24-48 hours after apoplexy, and sometimes months after (Dr. Pikus Discharge Summary; Case Study at 2-3). In DeRienzo's case, the symptoms appeared shortly after the back surgery, which lasted only six hours. (Dr. Pikus Discharge Summary.) Based on the science Dr. Pikus himself raises, the unexplained possibility remains that DeRienzo suffered the pituitary apoplexy well before the surgery.

Far from providing evidence establishing causation, Dr. Pikus has left the door wide open. In the final analysis, he

has merely set forth a theory that, in general, surgery may cause pituitary apoplexy (Pikus 77; Case Study, at 3). Any opinion he has articulated regarding DeRienzo's case in particular, however, is merely conclusory speculation and, as such, is inadmissible. <u>Kumho Tire</u>, 526 U.S. at 153-54, 156-57; <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997); <u>Amorgianos</u>, 303 F.3d at 266; <u>Riegel v. Medtronic</u>, 451 F.3d at 126; <u>Washburn v. Merck & Co.</u>, 213 F.3d 627 (table), No. 99-9121, 2000 WL 528649, at *2 (2d Cir. May 1, 2000).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the motion for partial summary judgment be granted, together with such other and further relief be granted as the Court deems just and proper.

Dated:    New York, New York
          February 22, 2008

                    HOGUET NEWMAN REGAL & KENNEY, LLP


                    By: _____
                         Ira J. Lipton (IL-4835)

                    10 East 40th Street
                    New York, New York 10016
                    (212)689-8808
                    *Attorneys for Defendants*