UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3|9|10

GEORGE DERIENZO,

        Plaintiff,

- against -

METROPOLITAN TRANSPORTATION
AUTHORITY and METRO-NORTH
COMMUTER RAILROAD,

        Defendants.

**OPINION AND ORDER**

01 Civ. 8138 (PKL)

**APPEARANCES**

THE MAURER LAW FIRM PLLC
300 Westage Business Center Drive, Suite 360
Fishkill, New York 12524
Ira M. Maurer, Esq.

Attorneys for Plaintiff George DeRienzo

HOGUET NEWMAN REGAL & KENNEY, LLP
10 East 40th Street
New York, New York 10016
Brian C. Dunning, Esq.
Ira J. Lipton, Esq.

Attorneys for Defendants Metropolitan Transportation Authority
and Metro-North Commuter Railroad

**LEISURE, District Judge:**

Plaintiff, George DeRienzo, brings this action against defendants, Metropolitan Transportation Authority and Metro-North Commuter Railroad pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, alleging personal injuries sustained as a result of a hazardous condition in defendants' workplace.  Specifically, plaintiff alleges that while working as a MTA police officer he slipped on debris that had collected at the top of a staircase and subsequently fell down the flight of stairs, injuring his back.  After his alleged fall, plaintiff underwent back surgery, which caused, according to plaintiff, a previously undiagnosed tumor to hemorrhage, or become "apoplectic."  Plaintiff claims that defendants violated FELA's requirement that an employer provide its employees a safe workplace by failing to exercise reasonable care in informing and protecting him from the debris that had collected on the staircase.

Defendants previously moved for summary judgment on the grounds that plaintiff's alleged accident was not foreseeable within the meaning of the FELA statute, and that plaintiff had failed to demonstrate that his alleged injuries were caused by the fall.  This Court granted defendants' motion as to the issue of forseeability.  DeRienzo v. Metro. Transp. Auth., 404 F. Supp. 2d 555, 566-67 (S.D.N.Y. 2005).  Because forseeability is

1

a necessary element of all of plaintiff's claims, this Court did
not address defendants' arguments concerning causation.  Id. at
567.  On June 20, 2007, the Second Circuit held that disputed
questions of material fact exist as to the issue of
forseeability and, therefore, it was inappropriate for this
Court to grant summary judgment as to this issue.  DeRienzo v.
Metro. Transp. Auth., 237 Fed. Appx. 642, 646 (2d Cir. 2007).
The Second Circuit further held that, on remand, this Court
should consider whether summary judgment is appropriate on the
issue of causation.  Id. at 646-47.

     The parties submitted supplementary briefing to address
issues raised by the Second Circuit's June 20, 2007, ruling.
Defendants chose not to revisit the Second Circuit's
determination that summary judgment is not appropriate on the
issue of forseeability.  See id. at 646.  Therefore, whether
plaintiff's injuries were reasonably foreseeable remains a
genuine issue of material fact.  While defendants initially
moved for summary judgment on causation as to (1) plaintiff's
back injuries, and (2) plaintiff's pituitary apoplexy allegedly
caused by his back surgery, defendants now have limited their
renewed motion for partial summary judgment on causation solely
to the issue of plaintiff's pituitary apoplexy allegedly caused

by his back surgery.[1]  (See Def.'s Mem. of Law in Sup. of Summ.
J. ("Def.'s Mem.") 1 n.1.)  For the reasons stated below,
defendants' motion for partial summary judgment is granted.

## BACKGROUND

### I.   Plaintiff's Injuries

Plaintiff was hired by defendant Metro-North as a police
officer in 1991, and retired with a disability pension on
October 9, 2002.  (Def.'s Local Rule 56.1 Statement ("Def.'s
56.1") ¶ 1.)  Plaintiff claims that, while on duty on September
8, 1998, he slipped and fell down a flight of steps located at
Oak Street on Metro-North property in Mount Vernon, New York
(the "Steps").  (Id. ¶ 3.)  Plaintiff was placed on injury leave
by Metro-North from September 8, 1998, until November 10, 1998.
(Id. ¶ 6.)  In November 1998 plaintiff was deemed qualified to

---

[1] This Court's 2005 summary judgment ruling in favor of defendants was
grounded on plaintiff's failure to file a counterstatement to defendants'
Local Rule 56.1 statement of material facts.  In support of the current
renewed motion for partial summary judgment, defendants have filed a renewed
Local Rule 56.1 statement of material facts, and plaintiff has now filed both
a Local Rule 56.1 counterstatement to these material facts and a statement of
additional material facts that he claims are not in dispute.  No objection
has been raised to plaintiff's submission of these statements, and the Court
has considered these statements in rendering the current decision.  As
plaintiff has now submitted a Local Rule 56.1 counterstatement of material
facts, and a statement of additional material facts, there is no need for
this Court to decide, as the Second Circuit directed, whether there is a
potential conflict between Local Rule 56.1 and Federal Rule of Civil
Procedure 56 when a party fails to file a Local Rule 56.1 statement.  See
DeRienzo v. Metro. Transp. Auth., 237 Fed. Appx. 642, 647 (2d Cir. 2007).
Furthermore, in light of the well-developed record on the specific issues
addressed by this renewed motion for partial summary judgment, the Court
notes that it has undertaken its own thorough review of the record in
deciding this motion.  See id. at 646-47; Holtz v. Rockefeller & Co., 258
F.3d 62. 73 (2d Cir. 2001).

return to work, and he remained on full active duty until the
following March.  (Id. ¶ 7.)  Plaintiff alleges that defendants
were negligent in the maintenance and design of the Steps
thereby causing his fall and subsequent injuries.  (Id. ¶ 3.)

Plaintiff claims that the fall down the Steps caused
injuries to his back that ultimately required him to undergo
back surgery.  (Id. ¶¶ 3, 8.)  Plaintiff's May 4, 1999, back
surgery (the "May 4 Surgery") was performed by Dr. Damon
DelBello.  (Id. ¶¶ 3, 8, 13-14.)  Dr. DelBello performed the May
4 Surgery from the anterior aspect—the front of plaintiff's
body—using a technique that involved an incision in the abdomen,
expansion of the abdomen with gas, and the use of a device that
allowed the surgeons to see and operate on plaintiff's spine.
(Id. ¶ 14; Pl.'s Local Rule 56.1 Statement of Additional
Material Facts ("Pl.'s. 56.1 Add.'l") ¶ 1.)  While he was
recovering from surgery, plaintiff developed a headache,
experienced visual disturbances, and began to have difficulty
moving his eye.  (Def.'s 56.1 ¶ 16.)  On May 5, 1999, CT and MRI
scans revealed that plaintiff had a large, previously
undiagnosed tumor on his pituitary gland, and that this tumor
had become apoplectic (or hemorrhaged).  (Id.)  Plaintiff
underwent an emergency operation, during which most of the tumor
was removed by Dr. Harold Pikus.  (Id. ¶ 16-17.)

Plaintiff claims that his May 4 Surgery caused his tumor to hemorrhage, and that the hemorrhaging tumor caused a number of serious injuries, including permanent brain damage and cognitive dysfunction.  (Pl.'s 56.1 Add.'l ¶¶ 17-18; Pl.'s Mem. of Law in Opp.'n to Summ. J. ("Pl.'s Mem.") 4-8.)   Plaintiff further claims that in the absence of the May 4 Surgery his tumor would have been discovered before it hemorrhaged.  (Pl.'s 56.1 Add'l. ¶ 18.)

## II.  **Plaintiff's Theory of Causation**

In support of his theory that the May 4 Surgery caused his tumor to hemorrhage, plaintiff relies primarily on the testimony of Dr. Pikus, the neurosurgeon who performed the operation to remove his tumor.  Plaintiff supplements Dr. Pikus's opinion with testimony from Dr. David Blum, an endocrinologist who began to treat plaintiff after his May 4 Surgery, and Drs. DeBello and Cristofaro, physicians who treated plaintiff's back injury.

According to plaintiff, there are three general reasons why pituitary tumors become apoplectic, all of which are related to events that can occur during surgery.  (Id. ¶ 8.)  The first reason a pituitary tumor may become apoplectic during surgery is if a patient experiences a significant drop in blood pressure. (Id.; Pl.'s Mem. 5.)   A drop in blood pressure may cause capillaries near the tumor to cease to function due to an

insufficient amount of oxygen and nutrients.  (Pl.'s 56.1 Add.'l
¶ 8; Pl.'s Mem. 5.)  When the patient's blood pressure returns
to its normal level, the dead capillaries can burst, causing the
tumor to become apoplectic.  (Pl.'s 56.1 Add.'l ¶ 8; Pl.'s Mem.
5.)  The second reason is if a patient's blood pressure becomes
too high during surgery, blood vessels running through a
pituitary tumor may burst, causing the tumor to hemorrhage.
(Pl.'s Mem. 5.)  Finally, plaintiff contends that a pituitary
tumor may become apoplectic due to "congestion of the blood"
caused by the use of gas to expand a patient's abdomen during
surgery.  (Id.)

Plaintiff concedes that Dr. Pikus "cannot say which of the
three mechanisms caused" his pituitary apoplexy.  (Pl.'s 56.1
Add.'l ¶ 11.)  However, plaintiff maintains that Dr. Pikus is
able to conclude within a reasonable degree of medical certainty
"that one of the three mechanisms  . . . almost certainly led to
the hemorrhage within [] [plaintiff's] [p]ituitary gland." (Id.;
Pl.'s Mem. 6-7.)

Plaintiff contends that Dr. Pikus's opinion that the May 4
Surgery caused his apoplexy is based on a differential
diagnosis.  (Pl.'s Mem. 6.)  Plaintiff asks the Court to accept
Dr. Pikus's opinion that plaintiff's pituitary apoplexy was
caused by his back surgery based on this differential diagnosis.
(Id. 9-16.)  Plaintiff maintains that the close temporal

proximity between his May 4 Surgery and the identification of
the tumor lends further support to Dr. Pikus's conclusion that
the May 4 Surgery was what caused the apoplexy.  (Id. 11-12.)
Plaintiff offers the opinions of three other treating
physicians, Drs. Blum, DelBello and Crisofaro, that focus on the
short period of time between the May 4 Surgery and the discovery
of plaintiff's apoplectic tumor as evidence that the May 4
Surgery caused his apoplexy.  (See Pl.'s Mem. 11-15.)

   Plaintiff relies on a case study entitled "Pituitary
Apoplexy Following a Lumbar Spine Stabilization," authored by
Dr. Pikus, to support the theory that the May 4 Surgery was what
caused the apoplexy.  (Pl.'s Counter 56.1 ¶ 29.)  In the case
study, which details plaintiff's diagnosis and treatment, Dr.
Pikus notes that the "retraction and ligation of various blood
vessels in the [course of back surgery] and possibly other
hemodynamic changes caused by the surgery" may have caused the
apoplexy.  (Lipton Decl. Ex. 9 (Case Study) at 3.)   However,
the case study is clear that "[c]ompromise of blood flow [during
surgery] is not the only mechanism[] theorized as [a] possible
cause[] behind the development of pituitary apoplexy" and that
there are a number of alternative possibilities for why the
tumor became apoplectic, including hypertension, head trauma,
coughing, or sneezing.  (Id. at 3-4.)  The case study notes that
"there are no reported cases of pituitary apoplexy following a

7

herniated lumbar disc repair" and that "[f]urther work-up of the patient is necessary to see if any of [the identified] risk factors may have been the catalyst in the development of the pituitary apoplexy; perhaps the workup will ultimately show that the development of the syndrome in this patient was a spontaneous and unhappy coincidence." (Id. at 4.)

Defendants do not challenge the general credentials of plaintiff's proposed expert witnesses. Rather, it is defendants' position that Dr. Pikus's testimony is unclear concerning the cause of plaintiff's apoplexy, and that any conclusions reached by Dr. Pikus, or plaintiff's other treating physicians, are unreliable and inadmissible. More specifically, defendants argue that the opinions of Dr. Pikus and plaintiff's other treating physicians are not the product of an acceptable differential diagnosis because the physicians neither "ruled in" plaintiff's surgery as a possible cause of his apoplexy, nor did they "rule out" numerous other possible causes of the apoplexy that are unrelated to the May 4 Surgery. (See Def.'s Reply Mem. in Supp. Of Summ. J. ("Def.'s Reply") 3-8.)    While defendants apparently concede that there is a temporal connection between plaintiff's back surgery and the discovery of his apoplexy, defendants argue that an expert opinion based on temporal proximity alone is insufficient to establish causation.   (See id. at 8-10.)

## DISCUSSION

### I.  Standard of Review

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005) (quoting Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (Kearse, J.).  "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005) ("We will affirm the District Court's grant of summary judgment to defendants only

if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law."). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)); accord N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002).

## II.  The Federal Employers' Liability Act

Plaintiff's claims are brought pursuant to the Federal Employers' Liability Act ("FELA"), which provides that:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.  To prevail in a FELA action, "the plaintiff must prove the traditional common law elements of negligence: duty, breach, forseeability, and causation." Tufariello v. Long Island R.R., 458 F.3d 80, 87 (2d Cir. 2006).   However, "the

10

plaintiff's burden in making a showing of causation and
negligence is lighter under FELA than it would be at common law
because 'the theory of FELA is that where the employer's conduct
falls short of the high standard required of him by the Act and
his fault, in whole or in part, causes injury, liability
ensues.'"  Id. (quoting Kernan v. Am. Dredging Co., 355 U.S.
426, 438-39, 78 S. Ct. 394, 2 L. Ed. 2d 382 (1958)); see also
Williams v. Long Island R.R., 196 F.3d 402, 406 (2d Cir. 1999)
("[A] relaxed standard of negligence applies in FELA cases in
this Circuit.");  Sinclair v. Long Island R.R., 985 F.2d 74, 76-
77 (2d Cir. 1993) (McLaughlin, J.) (stating that "there is a
considerably more relaxed standard of proof for determining
negligence in FELA cases" than in other negligence cases)
(citations omitted).

     The relaxed standard of proof in a FELA action does not
alter the requirement that when "an injury has multiple
potential etiologies, expert testimony is necessary to establish
causation."  Wills v. Amerada Hess Corp., 379 F.3d 32, 46-47 n.7
(2d Cir. 2004) (interpreting the Jones Act, "which incorporates
FELA by reference"); see also Nealy v. U.S. Surgical Corp., 587
F. Supp. 2d 579, 586 (S.D.N.Y. 2009) ("'Expert medical opinion
evidence is usually required to show the cause of an injury or
disease because the medical effect on the human system of the
infliction of injuries is generally not within the sphere of the

common knowledge of the lay person.'" (quoting <u>Barnes v. Anderson</u>, 202 F.3d 150, 159 (2d Cir. 1999))); <u>c.f.</u> <u>Tufariello</u>, 458 F.3d at 88 (holding that expert testimony is not needed to establish causation when "there is a generally understood causal connection between physical phenomena . . . and the alleged injury that would be obvious to laymen") (citations omitted).[2] Summary judgment is proper if a party fails to provide admissible, necessary expert testimony on causation.  <u>See</u> <u>Amorgianos v. Amtrak</u>, 303 F.3d 256, 271 (2d Cir. 2002) ("[I]n the absence of any expert evidence as to general causation and a gap in plaintiffs' case . . . defendant was entitled to summary judgment because of plaintiffs' failure to present any admissible evidence in support of their theory of causation.").

## III. **Standard For Admissibility of Expert Evidence**

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007); <u>see</u> <u>also</u> <u>Baker v. Urban Outfitters, Inc.</u>, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003) (Preska, J.) ("The proponent of expert testimony

---

[2] Neither party suggests that causation can be established in this case absent expert testimony.  The Court agrees that determining what caused a tumor to hemorrhage is not the type of injury that would be "obvious to laymen," <u>Tufariello</u>, 458 F.3d at 88, or "within the sphere of the common knowledge of the lay person" <u>Nealy</u>, 587 F. Supp. 2d. at 586.

bears the burden of establishing its admissibility by a
preponderance of the evidence.").  The relaxed standard of proof
applicable to FELA actions does not alter the requirement that
expert testimony meet the standards set forth in Federal Rule of
Evidence 702.  See Amerada Hess Corp., 379 F.3d at 47 ("[T]he
standards for determining the reliability and credibility of
expert testimony are not altered merely because the burden of
proof is relaxed."); Campbell v. CONRAIL, No. 05 Civ. 1501, 2009
U.S. Dist. LEXIS 810, at *3-4 (N.D.N.Y. Jan. 6, 2009); Higgins
v. Consol. Rail Corp., 06 Civ. 0689, 2008 U.S. Dist. LEXIS
94889, at *2 (N.D.N.Y. Nov. 21, 2008).

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has
> applied the principles and methods reliably to the
> facts of the case.

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals,
Inc. "interpreted Rule 702 to require district courts to act as
gatekeepers by ensuring that expert scientific testimony 'both
rests on a reliable foundation and is relevant to the task at
hand.'"  In re Fosamax Prod. Liab. Litig., No. 06 Civ. 4110,

2010 U.S. Dist. LEXIS 6931, at *20 (S.D.N.Y. Jan. 27, 2010)

(Keenan, J.) (quoting Daubert v. Merrell Dow Pharms., Inc., 509

U.S. 579, 592-93, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469

(1993)). On the issue of reliability, "Daubert enumerated a

list of factors that, while not constituting a 'definitive

checklist or test,' a district court might consider in

evaluating whether a proffered expert opinion has the required

indicia of scientific reliability," including: "whether a theory

or technique had been and could be tested, whether it had been

subjected to peer review, what its error rate was, and whether

scientific standards existed to govern the theory or technique's

application or operation."   Nimely v. City of N.Y., 414 F.3d

381, 396 (2d Cir. 2005) (quoting Daubert, 509 U.S. at 593-94);

see also Ruggiero v. Warner Lambert Co., 424 F.3d 249, 253 (2d

Cir. 2005).

When, such as here, a plaintiff seeks to establish

causation through the use of an opinion from a treating

physician, the "opinion on causation 'is subject to the same

standards of scientific reliability that govern the expert

opinions of physicians hired solely for purposes of

litigation.'"   Flemings v. Merck & Co. (In re Fosamax Prods.

Liab. Litig.), No. 06 Civ. 7631, 2009 U.S. Dist. LEXIS 109366,

at *18 n. 4 (S.D.N.Y. Nov. 23, 2009) (Keenan, J.) (quoting

14

Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000)).

Plaintiff asserts that his treating physicians employed a differential diagnoses in concluding that the May 4 Surgery caused his tumor to hemorrhage. (See Pl.'s Mem. 9-12.) "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." Ruggiero, 424 F.3d at 254 (citation and internal quotation marks omitted). When an expert relies on a differential diagnoses to "'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology." Id. (citations omitted); see also In re Fosamax Prods. Liab. Litig., 2010 U.S. Dist. LEXIS 6931, at *22-24. "While an expert need not rule out every potential cause in order to satisfy Daubert, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." In re Fosamax Prods. Liab. Litig., 2010 U.S. Dist. LEXIS 6931, at *23 (quoting Israel v. Spring Indus., No. 98 Civ. 5106, 2006 U.S. Dist. LEXIS 80863, at *20 (E.D.N.Y. Nov. 3, 2006)).

A district court "has broad discretion in determining whether in a given case a differential diagnosis is enough by

itself" to prove causation.  Ruggiero, 424 F.3d at 254.
However, an expert's opinion should be grounded in more than the
mere temporal proximity between a plaintiff's symptoms and the
alleged cause of the symptoms.  See Washburn v. Merck & Co., No.
99-9121, 2000 U.S. App. LEXIS 8601, at *5 (2d Cir. 2001)
(affirming exclusion of expert testimony as unreliable where the
conclusion that defendant's vaccine caused plaintiff's injuries
"was based on little more than temporal correlation between
[plaintiff's] vaccination and the onset of symptoms"); Spring
Indus., 2006 U.S. Dist. LEXIS 80863, at *21 (excluding expert
testimony on causation where sole justification for the opinion
was "a temporal correlation between the onset of [plaintiff's]
symptoms and the presence of the alleged cause.").

## IV.  Application

### A.  Dr. Pikus

Dr. Pikus is a board certified neurosurgeon who
currently practices medicine in North Carolina.  (See Maurer
Aff. Ex. 1 (Deposition of Dr. Harold Pikus ("Pikus Dep.")) at
10.)  Dr. Pikus was not present during plaintiff's May 4
surgery.  Rather, Dr. Pikus's treatment of plaintiff began on
the day that plaintiff was brought to the Westchester Medical
Center for emergency surgery to remove his apoplectic tumor.
(See id. at 10-11.)

## 1.   Dr. Pikus's Testimony

At his deposition, Dr. Pikus testified "that the back surgery was probably what caused [plaintiff's] pituitary tumor to hemorrhage." (Id. at 32.)   When asked to explain the basis for his conclusion, Dr. Pikus stated that "nobody really knows why in any particular circumstance a hemorrhage occurs" but that there are "three general reasons" why a tumor may hemorrhage, including:   a significant loss of blood pressure during surgery; a significant rise in blood pressure during surgery; and "congestion of the blood" due to pumping a patient's abdomen full of gas during the surgery. (Id. at 33-36.)   Dr. Pikus admitted that he had no prior personal experience with a tumor that had hemorrhaged due to lower back surgery and that while "[i]t's infrequent" and occurs in "[p]robably about two percent" of cases, he has personally observed tumors that have hemorrhaged "without the insult of surgery." (Id. at 37, 72.)

Dr. Pikus did not directly connect any of the "three general reasons" he identified for why a tumor can hemorrhage during surgery to the particular circumstances of plaintiff's case.   During his deposition, Dr. Pikus reviewed an anesthesiologist's record of plaintiff's May 4 Surgery. (See id. at 66-71.)   The anesthesiologist's record documents a number of plaintiff's vital signs throughout the course of his May 4 Surgery.   While Dr. Pikus declined to speculate as to

17

plaintiff's normal blood pressure, Dr. Pikus testified that it
appeared that plaintiff's blood pressure dropped during the
course of the surgery.  (See id. at 69-70.)  However, Dr. Pikus
explicitly refrained from drawing any conclusions from these
records, stating that he is "not an expert in understanding the
blood pressure requirements of a particular individual" and that
he "really can't give [] an expert's opinion" on whether the
apparent drop in plaintiff's blood pressure during surgery was
enough of a drop to cause his tumor to hemorrhage, "because it's
not [his] area of expertise."  (Id. at 69-71.)

Dr. Pikus published a case study based on his treatment of
plaintiff.  (See id. at 73-76.)  Prior to the publication of
this case study, Dr. Pikus was not aware of any other published
reports of lower back surgery causing a pituitary tumor to
hemorrhage.  (See id. at 78-79.)  In his case study, Dr. Pikus
provided a summary of plaintiff's health condition and the
process that led to the identification of the pituitary tumor.
(See Case Study at 2.)  In discussing the diagnosis and
treatment of the tumor, Dr. Pikus noted that plaintiff suffers
from hypertension and obesity and that these conditions may have
been contributing factors to the tumor becoming apoplectic.
(See id. at 3.)  Dr. Pikus detailed other research that has
found that:

18

> risk factors for the development of pituitary apoplexy
> include, edema, positive pressure ventilation, changes
> in intracranial pressure, like those that occur during
> a lumbar puncture or even caused by coughing and
> sneezing, hypertension . . . bleeding disorders,
> anticoagulant therapy, radiation therapy, diabetes
> mellitus and diabetic ketoacidosis, head trauma,
> shock, Sheehan's syndrowm, estrogen therapy,
> bromocryptine therapy, [and] changes in arterial
> pressure, such as those that occur in carotid
> arteiography.

(Id. at 4.)  Dr. Pikus noted that a possible cause of the

apoplexy may be plaintiff's May 4 Surgery, but that "these are

mere speculations, as there are no reported cases of pituitary

apoplexy following a herniated lumbar disc repair" and that

"[f]urther work-up of this patient is necessary to see if any of

these risk factors may have been the catalyst in the development

of the pituitary apoplexy; perhaps the workup will ultimately

show that the development of the syndrome in this patient was a

spontaneous and unhappy coincidence."   (Id.)


### 2.   The Admissibility of Dr. Pikus's Testimony

There is no evidence that Dr. Pikus engaged in a

differential diagnosis, or any other admissable scientific

process, before concluding that plaintiff's May 4 Surgery was

what caused his tumor to hemorrhage. Plaintiff, therefore, has

failed to meet his burden of proving that Dr. Pikus's testimony

is sufficiently reliable under Rule 702 and Daubert.


19

Plaintiff does not explain what specific methodology Dr. Pikus used to "rule in" plaintiff's May 4 Surgery as the cause of his apoplexy. Plaintiff is correct that the lack of any published reports of a pituitary tumor becoming apoplectic due to lower back surgery is not necessarily fatal to Dr. Pikus's testimony. See Amorgianos, 303 F.3d at 266 (noting that there is no requirement that an expert "back his or her opinion with published studies that unequivocally support his or her conclusions"). However, in the absence of scientific literature, Dr. Pikus does not explain what specific methodology he used to come to the conclusion that the May 4 Surgery caused plaintiff's tumor to become apoplectic. Dr. Pikus identified three "general reasons" why a pituitary apoplexy may occur—all of which relate to events that could occur during surgery—but Dr. Pikus could not pinpoint which of these three possibilities actually caused plaintiff's pituitary apoplexy. Rather, at his deposition, Dr. Pikus explicitly avoided discussing what occurred during plaintiff's May 4 Surgery, stating that he "can't give [] an expert's opinion" on whether a possible drop in plaintiff's blood pressure was enough to cause the tumor to hemorrhage. (Pikus Dep. at 70-71.)

Even more significant is that Dr. Pikus identified, but failed to exclude, alternative causes of plaintiff's apoplexy that are unrelated to his May 4 Surgery. In Dr. Pikus's case

20

study, which plaintiff relies on as evidence that Dr. Pikus's

opinion is based on a reliable scientific method, Dr. Pikus

identified a number of possible alternative causes of

plaintiff's apoplexy, including "that the development of the

syndrome in this patient was a spontaneous and unhappy

coincidence." (Case Study at 4.)  Dr. Pikus's failure to

"address [the identified] alternative causes and provide a

reasonable explanation for dismissing" them renders his

testimony inadmissible.  In re Fosamax Prods. Liab. Litig., 2010

U.S. Dist. LEXIS 6931, at *23 (quoting Spring Indus., 2006 U.S.

Dist. LEXIS 80863, at *20).

     While not raised by the parties, the Court is aware of

authority supporting the position that a failure on the part of

a treating physician to rule out all possible causes of an

injury goes to the weight, rather than the admissibility, of the

opinion.  See Green v. McAllister Bros., Inc., No. 02 Civ. 7588,

2005 U.S. Dist LEXIS 4816, at *40-41 (S.D.N.Y. Mar. 25, 2005)

("[T]o the extent that . . . physicians do not fully consider

and rule out all possible causes, such deficiencies generally go

to the weight of the evidence, not admissibility, and weighing

the evidence is a function for the jury." (quoting Figueroa v.

Boston Sci. Corp., 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003)))

(citations omitted); but see Cooper v. Smith & Nephew, Inc., 259

F.3d 194, 202 (4th Cir. 2001) ("A medical expert's opinion based

upon differential diagnosis normally should not be excluded
because the expert has failed to rule out every possible
alternative cause of a plaintiff's illness. . . . However, a
differential diagnosis that fails to take serious account of
other potential causes may be so lacking that it cannot provide
a reliable basis for an opinion on causation.  Thus, if an
expert utterly fails to consider alternative causes or fails to
offer an explanation for why the proffered alternative cause was
not the sole cause, a district court is justified in excluding
the expert's testimony.") (citations omitted); In re Fosamax
Prods. Liab. Litig., 2009 U.S. Dist. LEXIS 109366, at *22-24
(holding that testimony from a treating physician is
inadmissible because, among other failures, the physician failed
to rule out known potential causes of plaintiff's injuries);
Munafo v. Metro. Transp. Auth., Nos. 98 Civ. 4572, 00 Civ. 0134,
2003 U.S. Dist. LEXIS 13495, at *55-59 (E.D.N.Y. Jan. 22, 2003)
(excluding expert opinion on causation from a treating
psychopharmacologist, and holding that "[i]n lieu of any
conscientious attempt to rule out [identified] alternative
factors, [the proposed expert's] causation determination barely
rises above mere speculation and cannot meet the reliability
standards of expert testimony under Daubert.").

In this case, Dr. Pikus did not simply fail to fully
consider and rule out all possible causes of plaintiff's

22

injuries; rather, he failed to rule out any possible alternative

causes of plaintiff's apoplexy.  Dr. Pikus affirmatively

identified a wide-range of potential causes of plaintiff's

apoplexy, and stated that "[a] more thorough evaluation of the

patient would be needed to follow up on these possibilities."

(Case Study at 3.)  Nonetheless, without any indication that "a

more thorough evaluation" was conducted, Dr. Pikus managed to

conclude that the May 4 Surgery caused the apoplexy.  Admitting

such an opinion would run afoul of the important gatekeeping

function of this Court.  See, e.g., Kumho Tire Co. v.

Carmichael, 526 U.S. 137, 158-59, 119 S. Ct. 1167, 143 L. Ed. 2d

238 (1999) (Scalia, J., concurring) ("[T]rial-court discretion

in choosing the manner of testing expert reliability [] is not

discretion to abandon the gatekeeping function . . . . [or] to

perform the function inadequately.  Rather, it is discretion to

choose among reasonable means of excluding expertise that is

fausse and science that is junky."); Amorgianos, 303 F.3d at 265

("[T]he Supreme Court has made clear that the district court has

a 'gatekeeping' function under Rule 702—it is charged with 'the

task of ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at

hand.'" (quoting Daubert, 509 U.S. at 597)).

Plaintiff suggests that the close temporal relationship

between his May 4 Surgery and the discovery of his apoplectic

23

tumor supports Dr. Pikus's opinion on causation.  (See Pl.'s
Mem. 11-13.)  It may be true that, in appropriate circumstances,
a temporal relationship between two events can serve as one
aspect of a more thorough differential diagnosis.  See, e.g.,
Heller v. Shaw Indus., Inc., 167 F.3d 146, 158 (3d Cir. 1999)
("when the temporal relationship is strong and is part of a
standard differential diagnosis, it would fulfill many of the
Daubert/Paoli factors.") (emphasis added).  However, Dr. Pikus's
opinion on causation in this case is not the product of an
acceptable differential diagnosis as he neither "ruled in" the
May 4 Surgery as the cause of plaintiff's injuries nor did he
"rule out" other possible causes of plaintiff's injuries that
are unrelated to the May 4 Surgery.  Standing alone, the
temporal proximity between plaintiff's injury and the proposed
cause of his injury is insufficient to satisfy the requirements
of Rule 702.  See Washburn, 2000 U.S. App. LEXIS 8601, at *5
(holding that "the district court did not abuse its discretion
in determining that plaintiff's expert testimony was unreliable
because it was based on little more than temporal correlation
between [plaintiff's] vaccination and the onset of symptoms.");
In re Fosamax Prod. Liab. Litig., 2009 U.S. Dist. LEXIS 109366,
at *22-26 (finding proposed expert testimony on causation to be
"derived from a 'subjective belief' rather than from scientific
knowledge and methodologies" when the expert provided "no other

24

reasoning for his diagnosis other than the temporal relationship
and 'a little hum in the medical and dental community' regarding
the alleged link between [defendant's product] and [plaintiff's
injury]."); Spring Indus., 2006 U.S. Dist. LEXIS 80863, at *21-
22 (excluding testimony where expert "based his opinion on
what he viewed as a temporal correlation between the onset of
[plaintiff's] symptoms and the presence of the alleged cause.").

        For the foregoing reasons, the Court finds that Dr.
Pikus's opinion that Plaintiff's May 4 Surgery caused his
pituitary apoplexy is inadmissible.


        **B. Dr. Blum**

        Dr. David Blum is a board certified endocrinologist who
began to treat plaintiff after surgery was performed on his
pituitary tumor.  (Blum Aff. ¶¶ 2-3.)  For purposes of this
motion, plaintiff claims that Dr. Blum has offered an opinion
that the May 4 Surgery caused plaintiff's tumor to hemorrhage
because Dr. Blum submitted a sworn affidavit and testified at
his deposition that: 1) because "the [p]ituitary apoplexy
appears to have taken place at the time of Mr. DeRienzo's back
surgery," and because of the timing of plaintiff's cognitive
dysfunction and memory loss, it is his medical opinion that
plaintiff's cognitive injuries were caused by the "bleed out of
the [p]ituitary tumor during the spine surgery"; and 2) "while

it is not possible to explain the exact cause of the pituitary
apoplexy, it is well known that a patient can lose blood and/or
sustain a loss of blood pressure during surgery and that either
of these events can lead to [p]ituitary apoplexy in people with
[p]ituitary tumors."   (Blum Aff. ¶¶ 12-13; Pl.'s Mem 7.)

Defendants argue that to the extent that Dr. Blum has
offered an opinion on causation, that opinion is inadmissible,
as it is based solely on the temporal relationship between
plaintiff's back surgery and the discovery of his apoplectic
tumor.  (Def.'s Reply 8-9.)   The Court agrees.   There is no
indication that Dr. Blum's conclusions are based on anything but
the temporal proximity between plaintiff's May 4 Surgery and the
discovery of his apoplexy.[3]   Further, Dr. Blum stated that in
most cases, pituitary apoplexy is "spontaneous" and "not
triggered by anything," and that "we don't know the cause in
those cases."   (Blum Dep. 67.)   Dr. Blum does not explain the
apparent inconsistency between his belief that in most instances
a pituitary apoplexy is spontaneous and his opinion that, in
this case, the apoplexy did not occur spontaneously.

To the extent that Dr. Blum speculates that a loss of blood
pressure or a loss of blood during surgery could cause a tumor
to hemorrhage, he, like Dr. Pikus, did not connect this possible

---

[3]In fact, Dr. Blum agreed during his deposition that his "belief that the
pituitary tumor was affected by the back surgery is based upon the temporal
relationship between the back surgery and the pituitary apoplexy."   (Blum
Dep. 70-71.)

cause of plaintiff's injuries with what actually occurred during plaintiff's surgery.  (See Blum Dep. 70 (stating that he did not "know whether or not there was a drop in blood pressure during the course of [plaintiff's] back surgery."))  Plaintiff's lack of evidence as to specific causation provides an independent basis for summary judgment.  See Amerada Hess Corp., 379 F.3d at 46 ("In a case such as this, where an injury has multiple etiologies, expert testimony is necessary to establish causation . . . .").

### C.   Drs. DelBello and Cristofaro

Drs. DelBello and Cristofaro are orthopedic surgeons who have treated plaintiff on numerous occasions.  (See Pl.'s Mem. 8; Def.'s 56.1 ¶ 8.)  The only opinion as to causation that DeRienzo seeks to offer from Drs. DeBello and Cristofaro is that, based on "the close temporal relationship between the completion of [plaintiff's] back surgery and the onset of his" symptoms of pituitary apoplexy, DeRienzo's "pituitary apoplexy was caused by his extensive back operation."   (Pl.'s Mem. 15; Pl.'s Add.'l 56.1 ¶ 6.)  As is the case with DeRienzo's other proposed experts, this conclusory opinion is inadmissible to prove causation.  See In re Fosamax Prods. Liab. Litig., 2009 U.S. Dist. LEXIS 109366, at *21 ("A strong temporal relationship between the injury and its alleged cause may be one of several

27

factors considered by a medical doctor to reliably determine causation, but, standing alone, relying wholly on a temporal relationship is not sound scientific methodology that is admissible under Rule 702 and Daubert.").

### D.    Lack of Expert Testimony

Plaintiff has failed to provide admissible expert testimony to support his claim that the May 4 Surgery caused his pituitary apoplexy.  Without this necessary testimony, there is no genuine issue of material fact as to causation, and summary judgment is warranted.  See, e.g., In re Rezulin Prods. Liab. Litig, 441 F Supp. 2d 567, 579 (S.D.N.Y. 2006) (Kaplan, J.) (rejecting proposed expert testimony and granting summary judgment based upon plaintiff's failure to offer admissible evidence of causation).

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on the limited issue of whether plaintiff's May 4 Surgery caused his pituitary apoplexy is GRANTED.  The parties are directed to appear in Courtroom 18B on April 8, 2010, at 11:00 a.m. for a pre-trial conference.

**SO ORDERED.**

**New York, New York**

March  9 , 2010

_____

U.S.D.J.